**In Appeal of In re CALIFORNIA GULF PARTNERSHIP.**

Civ. A. No. 84–1885.

United States District Court,
E.D. Louisiana.

June 11, 1984.

J. Broocks Greer, III, Camp, Carmouche, Barsh, Hunter, Gray, Hoffman & Gill, New Orleans, for plaintiff.

Alan H. Goodman, Lemle, Kelleher, Kohlmeye, Hunley, Moss & Frilot, New Orleans, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MENTZ, District Judge.

In this bankruptcy case, California Gulf Partnership (hereinafter referred to as "debtor") has brought an appeal of the bankruptcy court's order modifying the automatic stay to allow Greycas, Inc. (hereinafter referred to as "creditor") to proceed against the debtor and the M/V REBEL BRIO. This Court has conducted a *de novo* hearing and hereby makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### (1)

In October of 1981, the debtor borrowed $2.8 million from the creditor to purchase a vessel known as the M/V REBEL BRIO. The loan was secured by a First Preferred Mortgage on this vessel.

### (2)

The loan has not been serviced since September, 1982. As of February 3, 1984, the date of the filing of the bankruptcy petition, the debtor owed the creditor $3,289,-405 in principal and interest on this loan.

### (3)

The parties agree that the current fair market value of the M/V REBEL BRIO is not more than $2.2 million. This figure could be substantially less, however, because of the severe recession in the offshore oil industry and the attendant decrease in demand for supply boats. Mr. Shelton G. Held, the creditor's marine surveying expert, stated that although the vessel was worth $2 million, no market exists for the boat at this price. Shelton predicted that conditions would improve within the next ten to twelve months such that the vessel would be able to sell for $2 million. Accordingly, the Court will assign the fair market value of the M/V REBEL BRIO at $2 million, although the Court believes that this valuation is probably high.

### (4)

The debtor has a net worth of anywhere between $-1,162,163.29 (negative) and $-3,125,163.29 (negative).[1] The debtor's only hard assets are two vessels, and the debtor does not have any equity in either vessel.

### (5)

The M/V REBEL BRIO is in need of significant repairs. These repairs would cost approximately $50,000. In addition, before the vessel could be delivered to a Mexican charterer, the vessel would need spare parts and fuel. The estimated cost of these items is approximately $31,000. There is $80,000 in an escrow account avail-

---

1. This wide variance is due to the debtor's claim against Brio Marine Corporation, a Mexican company, for breach of a charter agreement. The Court will not comment on this contingent asset valued by the debtor at $1,963,000, except to say that no lawsuit has been filed as of the date of the hearing.

able to the debtor to repair and equip the vessel.

(6)

The debtor has obtained a charter for the M/V REBEL BRIO with a reliable Mexican company, Flota Mexicana, S.A. This charter is in jeopardy, however, because the vessel is in the possession of a consent keeper; consequently, the debtor cannot effect delivery to Flota Mexicana, S.A., who in turn could elect to cancel the charter.

(7)

Under the terms of the charter, Flota Mexicana, S.A., is obligated to pay the debtor monthly, in advance, the following day rate for the M/V REBEL BRIO:

(a) $1,468.99 per day; plus

(b) an amount in Mexican pesos equivalent to $100 per day.

Flota Mexicana, S.A., is further obligated to "carry out its best efforts to obtain from Pemex an upgrading of the initial day rates" mentioned above. Flota Mexicana, S.A., has already obtained an increase in the day rate of $150.00.

(8)

The debtor, through its agent, Golden Gulf Offshore, Inc. ("Golden Gulf") has hired a superior management team which should insure that the vessel would be properly maintained during the pendency of the charter period. All of the evidence, including that of the creditor's expert, Shelton Held, indicated that Golden Gulf's marine operator in Mexico is excellently qualified to run the Mexican operation.

(9)

The First Preferred Mortgage provides that the M/V REBEL BRIO must be used in the Gulf of Mexico. Under the terms of the Flota Mexicana charter, that is precisely where the vessel will be employed.

(10)

The debtor has obtained all the necessary insurance on the vessel including special endorsements that would protect the income stream during the charter period in the event that the contract is repudiated or the Mexican currency becomes inconvertible.

(11)

The debtor has obtained a $100,000 line of credit on the Flota Mexicana, S.A., receivables from the First Financial Bank. Not only does this establish the reliability of Flota Mexicana, S.A., it also insures that the creditor could be paid timely in the event of any unforeseen delays in payment by Flota Mexicana, S.A.

(12)

The partners of the debtor have agreed to contribute $60,000 to the debtor to offset any net loss that the partnership may suffer in the first year of any reorganization plan. This amount could be used to augment amortization payments during the first few months of a reorganization plan until such time as the market improves and the debtor's profits increase.

(13)

The economic prospects for service companies employed in the offshore oil industry will continue to improve over the next two and one-half years. Robert J. Alario, who was qualified in the field of the economics of the offshore oil industry, testified that he expects dramatic improvement in supply vessel day rates within the next year and that the industry should achieve a robust recovery by 1986. Moreover, Alario stated that because of improved market conditions, he expects the value of the M/V REBEL BRIO to increase by as much as 25% during the recovery period. The Court finds Alario's testimony to be credible.

(14)

Both parties stipulated to the expertise of Daniel J. Sentilles in the field of marine surveying and engineering. Mr. Sentilles stated that the useful life of the M/V REBEL BRIO is 20 years, after which the vessel would be technologically obsolete. The vessel was put into service on November

13, 1981. Accordingly, the Court finds that the vessel has a remaining useful life of approximately 17.33 years.

### (15)

The debtor has proposed a debt liquidation plan that would provide the creditor with deferred payments of $20,000 a month, based on a day rate of $1,568.99 (including the U.S. equivalent of the Mexican peso payment.) The payments would commence immediately upon the boat being placed on charter, and very likely prior to a confirmation hearing on any submitted plan. Assuming that Flota Mexicana, S.A., is able to obtain increased day rates from Pemex up to $2000 per day, the debtor proposes to pay the creditor the following amount:

| Months 3–6 | 26,000 |
| Months 7–12 | 30,000 |

The Court believes that it is likely that the debtor will be able to fund these increased debt liquidation payments because

(a) within the next six months the market will improve substantially, thereby allowing Flota Mexicana, S.A. to obtain higher day rates from PEMEX;

(b) under the terms of the charter agreement, Flota Mexicana, S.A., is provided with an incentive to obtain the increases; and

(c) Flota Mexicana has already obtained an increase in the day rates of $150.00.

Additionally, a winch valued by Sentilles to be worth $60,000 would be sold. The proceeds from this sale would go to the creditor during the first year of a reorganization plan.

### (18)

The original interest rate on the debtor's loan was approximately 20.5%; the prime interest rate on October 13, 1981, the date the promissory note was signed, was 18.0%. Thus, the initial interest rate on the loan was 2.5 points over the prime rate.

### (19)

The prime interest rate on June 7, 1983, was 12.5%.

### (20)

The Special Master made the following amortization calculations:

(a) The monthly amortization payment on a $2 million mortgage paid out over 17.33 years at 12.5% (the current prime interest rate) is $23,564.50.

(b) The monthly amortization payment on a $2 million mortgage paid out over 17.33 years at 15.0% (2.5 points over the current prime interest rate) is $27,042.10.

(c) The monthly amortization payment on a $2 million mortgage paid out over 17.33 years at 17.0% (4.5 points over the current prime interest rate) is $29,939.30.

The Court adopts these amortization calculations as its own factual findings.

### (21)

The Special Master made the following present value calculations:

(a) Assuming a discount rate of 12.5%, monthly payments of $23,564.50 paid ratably over 17.33 years have a present value of $2 million.

(b) Assuming a discount rate of 15.0%, monthly payments of $27,042.10 paid ratably over 17.33 years have a present value of $2 million.

(c) Assuming a discount rate of 17.0%, monthly payments of $29,939.30 paid ratably over 17.33 years have a present value of $2 million.

The Court adopts these present value calculations as its own factual findings.

### (22)

The debtor has been able to come to an accommodation with the only other secured creditor involved in this case, Seafirst Commercial Corporation ("Seafirst"). Seafirst has indicated that it would likely vote to approve a reorganization plan that incorporated the agreement that it has arrived at with the debtor.

## CONCLUSIONS OF LAW

### (1)

The Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 and the Emergency Interim Bankruptcy Rule of the United States District Court for the Eastern District of Louisiana.

### (2)

■ The Court properly exercised its discretion by allowing the parties to present new evidence at a *de novo* hearing. Emergency Interim Bankruptcy Rule of the United States District Court for the Eastern District of Louisiana, § (E)(2)(B).[2]

### (3)

■ In order for the Court to modify the automatic stay imposed by 11 U.S.C. § 362, the Court must determine that the stay should be lifted either:

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

§ 362(d). The creditor has the burden of proof on the debtor's equity in the property; the debtor has the burden of proof on all other issues. § 362(g).

### (4)

■ The debtor lacks equity in the property. The M/V REBEL BRIO has a fair market value of $2 million; the debtor owes the creditor $3.3 million.

### (5)

Obviously, the M/V REBEL BRIO is necessary to any reorganization plan. But for the debtor to meet its burden of proof on this issue, it must also show that there is a reasonable expectation that it will be able to present a confirmable plan within a reasonable period of time. *In re Saypol*, 31 B.R. 796 (Bkrptcy., S.D.N.Y.1983); *In re Boca Development Associates*, 21 B.R. 624 (Bkrptcy., S.D.N.Y.1982).

### (6)

■ It is reasonable to expect that the debtor will be able to present a confirmable plan within the near future. To meet its burden the debtor must show:

(a) with respect to the secured claim that the creditor will retain a lien securing its claim and that the creditor will receive "deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of [the creditor's] interest in the [debtor's interest] in the property," 11 U.S.C. § 1129(b)(2)(A)(i);

(b) with respect to the unsecured claim, that at least no junior claim holder will receive payment on its claim prior to the creditor receiving property of a value, as of the effective date of the plan, equal to the allowed amount of its claim, § 1129(b)(2)(B);

(c) that at least one class of creditors will accept the plan, § 1129(a)(10); and

(d) that the plan will comply with the other requirements of § 1129.

### (7)

■ The secured claim of the creditor is equal to $2 million; the creditor has an unsecured claim equal to $1.3 million. 11 U.S.C. 506(a).[3] The debtor has demonstrated that

---

**2.** (B) In conducting review, the district judge may hold a hearing and may receive such evidence as appropriate and may accept, reject, or modify, in whole or in part, the order or judgment of the bankruptcy judge, and need give no deference to the findings of the bankruptcy judge. At the conclusion of the review, the district judge shall enter an appropriate order or judgment.

**3.** The creditor's loan is undersecured to the extent of $1.3 million. Consequently, interest on the loan does not continue to accrue during the pendency of the automatic stay, 11 U.S.C.

it is likely that it could propose a plan in which the creditor would receive deferred cash payment equal to the value of its secured claim. These payments would have to be made over a reasonable time, *In re Hollanger*, 15 B.R. 35, 47 (Bkruptcy., W.D.La.1981); *In re Shriver*, 33 B.R. 176, 187–188 (Bkruptcy., N.D.Ohio 1983), such as the remaining useful life of the vessel. The Special Master found that payments made in the amount of $27,042.10 per month over 17.33 years has a present value of $2 million, assuming a 15.0% discount rate.[4] The Court finds that it is reasonable to expect that a plan could be confirmed based on the above-mentioned assumptions and that the debtor would be in a financial position to make these deferred payments.

(8)

The creditor is entitled to make an election under 11 U.S.C. § 1111(b)(2). The effect of the § 1111(b)(2) election is to allow the undersecured creditor to maintain a lien on its collateral to secure the full amount of its claim, irrespective of the valuation of such collateral by the Court under § 506(a). Under the § 1111(b)(2) election, the creditor must receive deferred payments over a reasonable time that equal or exceed the total amount of its claim (i.e., $3.3 million), but the present value of these deferred payments need only equal the amount of the collateral (i.e., $2 million). Thus, even if the debtor exercised the § 1111(b)(2) election, a plan could still be confirmed under the assumptions described above. Collier on Bankruptcy. ¶ 1111.02 (15th Ed.1979); 124 Cong.Rec. H 11,104 (daily ed. Sept. 28, 1978); 124 Cong.Rec. S 17,421 (daily ed. Oct. 6, 1978).

(9)

█ The Court finds that it is likely that a plan could be proposed by the debtor wherein no claim holders whose claims are junior to those of the creditor would be paid prior to the creditor receiving property of a value, as of the effective date of the plan, equal to the allowed amount of its claim. This is the only protection that an unsecured creditor is entitled to under § 1129(b)(2)(B). *See In re Barlum Realty Co.*, 62 F.Supp. 81 (D.Mich.1945); *In re East Redley Corp.*, 20 B.R. 612 (Bkrptcy., E.D.Pa.1982); *Cf. In re National Trade Corp.*, 22 B.R. 877 (Bakrptcy., N.D.Ill., 1982).

(10)

The Court finds that it is likely that the debtor could obtain the approval of at least one class of creditors under a proposed plan. First, it is likely that Seafirst would approve a plan incorporating the agreement it entered into with the debtor. But even if such were not the case because, for example, the debtor has violated the anti-solicitation rules found at 11 U.S.C. §§ 1125–1126, the Court could designate a separate class of small unsecured claims for administrative convenience. 11 U.S.C. § 1122(b). This class could be impaired under a plan, and of course, could vote for acceptance of the plan.

(11)

Though neither party addressed the applicability of the other provisions of § 1129, the Court has reviewed these provisions and can find no reason to conclude that the debtor could not comply with them. No doubt, the debtor has demonstrated to the Court that it could propose a plan that is at least in compliance with the most troublesome provisions of this section. Accordingly, the Court believes that the debtor should be given a meaningful opportunity to rehabilitate itself. *In re Kleinsasser*, 12 B.R. 452 (Bkrptcy., D.S.D.1981).

(12)

█ The debtor has also met its burden in showing that the creditor's secured interest in the M/V REBEL BRIO, valued at $2 million, will be adequately protected during the pendency of the automatic stay and

§§ 502(b)(2) and 506(b), and during the pendency of the stay, the debt remains constant at $3.3 million.

4. The 15.0% discount rate assumes a rate 2.5 points above the current prime rate. The original loan was made at a rate that was 2.5 points above prime.

thereafter. The debtor has obtained the necessary insurance on the vessel. The debtor has demonstrated that the value of the vessel will increase, rather than decrease, in the short run because of improvements that will be made by the debtor and because of an improved economic climate. Finally, the debtor has proposed to make periodic cash payments. Payments made during the pendency of the stay would insure that the creditor would not receive less than the value of the collateral during that period. Payments made after confirmation, which by their nature would have to equal the present value of the collateral at confirmation, would insure that the creditor was adequately protected over time. Accordingly, the Court finds that the creditor is now and under a reorganization plan could be adequately protected. *See* 11 U.S.C. § 361; *In re Pine Lake Village Apartment Co.,* 19 B.R. 819 (Bkrptcy., S.D.N.Y.1982); *In re American Mariner Industries, Inc.,* 10 B.R. 711 (Bkrptcy., C.D.Cal.1981); *In re Murel Holding Corp.,* 75 F.2d 941 (2d Cir.1935).

(13)

 The debtor has moved to compel the creditor to turn over possession of the M/V REBEL BRIO to the debtor, pursuant to 11 U.S.C. § 542. Because the debtor is entitled to possession of the vessel pursuant to 11 U.S.C. § 363 and has demonstrated that the creditor is adequately protected, the Court hereby ORDERS that the vessel be turned over to the debtor within 72 hours hereof.[5]

Because this Court held a *de novo* hearing at which additional evidence was presented, it is necessary to REVERSE the decision of the Bankruptcy Court. The case is hereby REMANDED to the Bankruptcy Court for further proceedings which are consistent with this opinion.[6]

---

5. As an additional safeguard to the creditor, the Court further orders that the debtor commence repairs on the vessel immediately so that the vessel will be in compliance with United States Coast Guard standards. The escrow funds set aside for this purpose shall be used. This will serve to enhance the value of the creditor's collateral immediately.

6. The Court notes that the automatic stay was to have expired on June 5, 1984. Of course, the debtor has had to expend considerable resources to prosecute this appeal. This fact should be taken into consideration by the Bankruptcy Court when the debtor moves for an enlargement of time within which to file a reorganization plan. *See* 11 U.S.C. § 1121.