**In re Harold A. FENSKE and Laurel Fenske, Debtors.**

**Bankruptcy No. 88–05958.**

United States Bankruptcy Court,
D. North Dakota.

Dec. 29, 1988.

Glenn Fenske, Fargo, N.D., Ronald Frauenshuh, Jr., Ortonville, Minn., for debtors.

Wayne Drewes, Fargo, N.D., Trustee.

Brad Sinclair, Fargo, N.D., for Farm Credit Bank of St. Paul.

Wesley Huisinga, Minneapolis, Minn., U.S. Trustee.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

On November 21, 1988 Farm Credit Bank of St. Paul as successor in interest to the Federal Land Bank and the Production Credit Association (Bank) filed a Motion for Dismissal of the Debtor's pending Chapter 12 case and also on that date moved for relief from stay. Dismissal is sought principally for the reasons that the Debtors fail to meet the 50% gross income test necessary to qualify as "family farmers" and that under any financial scenario they lack the ability to reorganize under Chapter 12. Relief from stay is premised upon Section 362(d)(2)—a lack of equity coupled with an inability to achieve reorganization. Although not raised in the motions themselves, the Bank in its brief also charges the Debtors with bad faith and fraud in connection with the Chapter 12 filing.

Both motions, resisted by the Debtors, came on for hearing on December 12, 1988, at which the parties entered certain stipulations of fact on the record and agreed that the Court could receive the testimony of

Debtor, Harold Fenske, by deposition including all exhibits included within the deposition.

## FINDINGS OF FACT

From the matters stipulated to, the deposition and documents therein contained as well as the case file itself, the relevant facts are the following:

The Debtors reside in Hankinson, North Dakota where for a number of years they have farmed and also operated a grain elevator. The farm is comprised of 701 owned acres, 306 of which are presently enrolled in CRP and 61 are in ASCS set aside. Of the remaining acres, 226 acres along with 75 rented acres comprise the land available for crops.

Aside from farm acreage, the Debtors own 5 acres within the city limits of Hankinson and 5 acres in Arizona.

The Debtors and their four sons own an incorporated grain elevator known as the Fenske Feed and Grain Co. which is managed by Harold.

The Bank, fdba Federal Land Bank, holds first mortgages on all the Debtor's farm real property and on August 5, 1988 obtained a judgment of foreclosure. The balance due and owing FLB in consequence of its interest is $407,000.00. The Bank, fdba Production Credit Association holds a second mortgage on the farm land as well as a security interest in all farm equipment against which it obtained a judgment of foreclosure on August 5, 1988. The outstanding indebtedness owing PCA is $192,000.00. In addition, the elevator corporation is indebted in significant amounts to the Small Business Administration and Dakota Bank and Trust Company.

The 701 acres of farm land has been valued at $341,000.00 by the Bank's in-house appraiser as evidenced by an appraisal report stipulated into evidence. No report or testimony was introduced on behalf of the Debtor, however the parties did stipulate that the Debtor's valuation was $265,000.00. The farm machinery has an agreed value of $25,000.00. The parties have also stipulated that Federal Land Bank's current rate of interest is 12.25% and PCA's current rate of interest is 13.89%.

During the years 1981 through 1984 the Debtors farmed the land themselves. In 1985 and 1986 they cash rented the entire acreage to one of their sons for $37,355.00 and $29,513.00 respectively. During the years 1982 through 1985 the Debtor, Harold Fenske, also received a salary from Fenske Feed and Grain averaging $19,500.00 per year. Since 1985 the elevator business has been poor and no income has been received from that source since 1985. Although Harold hopes to receive a salary from the elevator in 1989 the company is at present not profitable and owes nearly $500,000.00. Efforts to sell the elevator company have been unsuccessful and in Schedule B–2 the Debtors themselves have attributed no value to the company.

In 1987 and 1988 the Debtors commenced farming their land themselves through an entity known as "L.H. Living Trust", a trust formed and administered by the Debtors in 1987 ostensibly for estate planning purposes. In 1987 all the Debtors' farm land was cash rented to the trust under a continuous lease by which the trust is to assume and pay all operating expenses with the Debtors receiving whatever is left. In 1987 no income was derived from the trust. Total 1987 income was $65,579.00 including a $25,838.00 short term gain from commodity trading. All crops grown in 1987 were held in storage and the only other income was $14,382.00 from CRP enrollment, $19,804 from ASCS set aside, $2,445.00 from a wildlife lease and $1,110.00 miscellaneous. Operating expenses in 1987, exclusive of living expenses, totalled $44,000.00. The only known living expense is a $830.00 per month mortgage payment the Debtors are paying on a home owed by their son but which they occupy. At a minimum the living expenses totalled $9,960.00 exclusive of food, clothing, and other obvious expenses. The minimum net income from all sources in 1987 was $11,619.00 but in actuality it would probably be much lower if complete living expense figures were factored in.

In 1988 the Debtors' total income received thus far including 1988 crops on hand is $108,955.00 inclusive of wildlife lease payment of $2,445.00, ASCS payment of $13,989.00, 1988 crops on hand of $42,-394.00, CRP payment of $14,382.00, 1987 crop sales of $34,635.00 and miscellaneous of $1,110.00. Not included is the $33,-000.00 cash rent from the trust since the trust payment if paid is subsumed by the actual farm income figures and would totally displace them if used. In any event, the L.H. Trust cash rent figures is an artificial reflection of the Debtors' income because it has not been paid to them in the past and is apparently payable only if funds are available after expenses. In actuality it is a payment from themselves to themselves. In 1988 the operating expenses totalled approximately $92,761.00 inclusive of an unpaid 1988 operating loan of $58,000.00, $22,761.00 in 1987 crop storage charges and $12,000.00 assumed living expenses. This leaves a net income of $13,-194.00 for the year 1988.

For 1989 and succeeding years the Debtors anticipate farming much as they have in the past with the suggestion by their counsel that they are now looking into eliminating the family trust arrangement. This means their income will be derived principally from the 301 crop acres, 306 CRP acres and the ASCS set aside acres plus whatever income is generated for them by their involvement with the grain elevator. There is the suggestion in their counsel's brief although no facts to support it that they are in serious negotiations with Agri-Managment, Inc. with regards to the elevator. Whatever fruit these negotiations bring will first have to satisfy the outstanding obligations of the elevator company and due to the Debtors' own assessment of the company's value it appears unlikely there would be any net gain from the sale. By their own projections the Debtors anticipate 1989 income of $65,338.00. Although Harold hopes to receive a small income from Fenske Feed and Grain in 1989, that is unlikely in view of the company's own financial problems. It is indebted to SBA and FDIC in the approximate sum of $380,-000.00 plus interest and upon which SBA

holds a mortgage on the elevator. It is also indebted to Dakota Bank and Trust who has obtained judgments against the company in the sum of $70,000.00. The Debtors themselves have not included in their 1989 projections any income from Fenske Feed and Grain nor from any other off-farm source. Operating expenses are projected at $19,819.00 plus assumed living expenses of $12,000.00 for a total of $31,-819.00. This leaves $33,519.00 available for debt service under the best scenario assuming prices remain stable and no crop failures occur.

The Debtors filed for relief under Chapter 12 on November 15, 1988 and have filed a motion under Section 522(f) to set aside the Bank's claimed security interest in farm machinery and equipment all of which has been valued at $25,000.00 for purposes of this motion.

## CONCLUSIONS OF LAW

### 1.

The Bank challenges the Debtors' status as "family farmers" under Section 101(17)(A) which defines a "family farmer" as an:

Individual and spouse engaged in a farming operation ... [who] receives from such farming operation more than 50% of such individual's or such individual and spouse's gross income for the taxable year preceding the taxable year in which the case concerning such individual or such individual and spouse was filed....

The relevant year for our purposes is 1987, a year in which the Debtors' total income from all sources was $64,978.00 of which $1,110.00 was derived from interest and dividend payments, $25,838.00 from short term gain in the commodity futures market, $2,445.00 from a wetlands lease, $14,-382.00 from CRP, $19,804.00 from ASCS, and $1,399.00 from pensions and other annuities. Save for the ASCS payment, the Bank argues that the 1987 income is non-farm generated because it does not emanate from those categories of enterprise defined in Section 101(20) as being indicative of a farming operation. The Debtors concede that the $1,110.00 from interest

and dividend payments, the $2,445.00 from a wetlands lease, and the $1,399.00 from pension and other annuities are excludable income but otherwise believe that all income ought to be included in the eligibility calculation.

 All of the challenged 1987 income sources, with the possible exception of commodity futures, and the conceded items of income, are related to the Debtors' status as farmers. The fact that a portion of the land is enrolled in CRP or an ASCS set aside does not remove the resulting income from the farm related category. This Court adheres to a fairly broad case-by-case determination of what activity ought to be regarded as a farming operation. *In re Paul,* 83 B.R. 709 (Bkrtcy.N.D.1988). Chapter 12 is intended as a reorganizational vehicle for family farmers and if in the course of tilling the soil, ranching, etc., a farmer also engages in legitimate agri-business endeavors as a part of his operation, the income derived from that allied endeavor is capable of being included in the notion of farm-related income. As emphasized by the court in *In re Armstrong,* 812 F.2d 1024, 1026 (7th Cir.1987), implicit in the definition of family farmer is the inclusion of "general activities inherent in farming and, we believe, the means ... necessary to perpetuate the farming operation the definition speaks of." CRP enrollment and ASCS set aside are nationwide programs generally available to farmers and ranchers. In North Dakota alone over two million acres have been enrolled in CRP thus far. One should not conclude from this statistic alone that there is a mass exodus from farming or that those who have enrolled and taken advantage of the program do not intend to farm. Those individuals who while actively engaged in farming, avail themselves of such programs and thereby maximize the profitability of their operations are no less engaged in a farming operation. The only exception is where the farmer essentially abandons farming as a livelihood and becomes merely a passive recipient of investment income. In that case income derived from wholesale cash renting of land or CRP enrollment is not derived from a farming operation. The Debtors in the instant case are actively farming and intend on doing so for the foreseeable future. The majority of the Debtors' 1987 income is derived from a farming operation even when the commodity future profits and $4,954.00 of conceded non-farm income is excluded from the calculation. They are qualified to invoke the benefits of Chapter 12.

### 2.

 The principal thrust of the Bank's motions for dismissal under Section 1208(c)(9) and for relief from stay under Section 362(d)(2) is that reorganization is simply not feasible when one uses realistic income and expense figures already before the Court. The Debtors, noting that their Petition was filed only a month ago, argue that it is premature to get into the question of cash flow analysis which is better taken up at confirmation. This Court believes debtors ought to be afforded an opportunity to reorganize and avail themselves of sufficient time within which to formulate a plan. Debtors' counsel in his brief makes a plea for additional time arguing that he has only recently been on the case and is wrestling with various plan and cash flow alternatives but has not had sufficient time to formulate a concrete proposal. The Court sympathizes with counsel. However, a party in interest is free to move for dismissal or relief from stay at any time and may pursue such remedies even within the 90-day plan filing period. Once filed, such motions immediately bring to the forefront the question of a debtor's reorganizational ability. Normally, at such an early stage neither the creditor nor debtors for that matter have concrete financial data readily at hand and both are hard pressed to either prove or disprove reorganizational prospects. Under Section 1208 the party seeking dismissal bears the burden of establishing the absent of a reasonable likelihood of reorganization while under Section 362(d)(2), once the creditor has shown there to be no equity as in this case, it is for the debtor to prove there is a reasonable possibility of a successful reorganization within a reasonable time. *United States v. Timbers of Inwood Forest,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). While it is true as Debtors' counsel points out that

a less detailed showing is normally required on the part of a debtor during the early stages of a case it is also an unfortunate reality that a Chapter 12 debtor when faced with such motions early on in the case, does not have the luxury of waiting until an eventual confirmation hearing to show the likelihood of reorganization but must be prepared to meet the movant's evidence. The greater the evidence is on the creditor's side the greater is the debtor's obligation to prove the converse likelihood of reorganization.

■ To be confirmable, a plan, as relevant to the issue presented, must demonstrably preserve the interests of the secured creditors by distributing to each such creditor property having a value as of the effective of the plan, not less than an allowed amount of the claim. 11 U.S.C. § 1225(a)(5)(B)(ii). In order to receive value as of the effective date of the plan at least equal to the allowed amount of the claim, interest must be paid. This interest rate is called a discount rate. *In re Edwardson,* 74 B.R. 831 (Bkrtcy.N.D.1987). The necessity of preserving a secured creditor's interest impacts upon the second relevant confirmation element which is that the debtor must be able to make all payments under the plan. 11 U.S.C. § 1225(a)(6). In a word, the debtors must be able to show that reorganization is feasible. A debtor presenting a Chapter 12 plan bears the burden of proving that the proposal is both realistic and will cash flow. *In re Dittmer,* 82 B.R. 1019, 1022 (Bkrtcy.N.D.1988); *In re Bartlett,* 92 B.R. 142 (D.C.E.D.N.C. 1988). Whether faced with a motion to dismiss, a motion for relief from stay, or plan confirmation, a debtor must deal with and face up to the financial realities of his situation particularly when those realities have been established by the facts. The Bank in the instant case has presented the Court with fairly persuasive financial data and testimony suggesting that under any prospective plan proposal, the Debtors, so long as they retain the farm land mortgaged to the Bank, and have no available off farm income, are incapable of cash flowing a viable plan.

■ Post-confirmation income must be sufficient to afford the secured creditor a property distribution with a value at least equal to the allowed amount of its claim. Here, the Debtors are faced with a creditor who is fully secured in the real property comprising the farm as well as in farm machinery. Even without considering the farm machinery payback, the ability of the Debtors to cash flow a plan is doubtful. This is evident even assuming they are successful in the pending motion for avoidance of PCA's interest in the machinery. When taken together, Federal Land Bank's first mortgage of $407,000.00 and PCA's second of $192,000.00 leaves the Bank fully secured as regards the 701 acres of farm land. Regardless of whether the present value of the interest entitled to protection is $341,000.00 or $265,000.00, the Debtors must have sufficient cash flow to provide sufficient sums to provide the Bank a stream of payments which over time will equal the present value. Utilizing a discount rate which fairly approximates what the Debtors would have to pay the Bank for a loan of equivalent terms in the open market very likely means in this case a rate of at least 12% for the real estate and 13–14% for chattels. *See, United States v. Neal Pharmacal Company,* 789 F.2d 1283 (8th Cir.1986); *In re Camino Real Landscape,* 818 F.2d 1503 (9th Cir.1987); *In re Konzak,* 78 B.R. 990 (Bkrtcy.N.D.1987); *In re Milspec, Inc.,* 82 B.R. 811 (Bkrtcy.E.D. Va.1988).

Repayment of $341,000.00 over a term of thirty years at 12% interest requires an annual payment of $42,333.00. If the value of $265,000.00 is used at the same term and rate the annual payment is $32,898.00. On top of this the Debtors must generate sufficient cash to pay the trustee his statutory 10% fee which at a minimum will be $3,289.00 and possibly as high as $4,233.00 per plan year. Thus during the three to five years of plan existence the Debtors' income will have to annually generate as much as $46,566.00 for debt service and no less than $36,187.00, depending upon how the farm land is valued. Should the Debtors fail in their 522(f) motion then PCA's interest in the farm machinery valued at $25,000.00 will also have to be protected in a similar fashion. Used machinery is typi-

cally depreciated out over a seven to ten year period. *See, e.g., In re California Gulf Partnership,* 48 B.R. 959, 964 (D.C.E. D.La.1984) where the court said payments must be made over a reasonable time which in the case of depreciable chattels means its remaining useful life. Applying an interest rate of 13% over seven years on a present value of $25,000.00 results in annual payments of $5,652.00 plus a trustee's fee of $565.00 during the plan years.

As set forth in *In re Clarkson,* 767 F.2d 417 (8th Cir.1985), plan feasibility contemplates:

> The probability of actual performance of the provisions of the plan. Sincerity, honesty and willingness are not sufficient to make the plan feasible and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts. 767 F.2d at 420.

This Court will accord to Debtors the benefit of the doubt where it appears they have a reasonable chance of meeting their required plan payments but will not ignore financial realities evident early on in the case. *In re Hansen,* 77 B.R. 722 (Bkrtcy. N.D.1987). Unfortunately, the Debtors' prospects do not appear reasonable from the facts highlighted by the Bank and they have not countered those facts with data showing how significant cash flow can be maintained. Their own inflated 1989 net income figure of $33,519.00 will not service the Bank's interest in the real property even at the lower land valuation let alone at the higher valuation. Without substantial inputs of off-farm income, (a wholly speculative prospect), reorganization is simply not feasible considering the requirements of Sections 1225(a)(5)(B)(ii) and (a)(6).

3.

The Bank in its brief also raises serious questions of whether the requirements of Section 1225(a)(4) can be met and also charges the Debtors with bad faith and fraud. The perceived fraud stems from the transfer by the Debtors of an interest in the farm land to the family trust during the pendency of the Bank's foreclosure efforts. The conveyance of farm property to a trust on the eve of foreclosure or bankruptcy is often regarded by the courts as highly irregular and in some cases results in consequences adverse to the debtors. *In re Welsh,* 78 B.R. 984 (Bkrtcy.W.D.Missouri 1987). While the facts may bear some indicia of a fraudulent conveyance under Chapter 13–02.1 of the North Dakota Century Code, it is premature to reach a determination on this issue and indeed it is not necessary to this Opinion that the allegation be resolved due to the Court's conclusion regarding reorganizational prospects.

### CONCLUSION

The Debtors have no equity in the real property comprising their farm and have no reasonable prospect for a cash flow sufficient to fund a confirmable Chapter 12 plan. Accordingly, it is

ORDERED the motion by Farm Credit Bank of St. Paul for relief from stay is GRANTED. It is

FURTHER ORDERED that the Debtors' Chapter 12 case be DISMISSED ten days from entry of this Order.

SO ORDERED.