**In re Steve J. SZUDERA, Diane Szudera, d/b/a Golden Valley Diesel, d/b/a Szudera Farms, Debtors.**

No. 01–31022.

United States Bankruptcy Court, D. North Dakota.

Nov. 23, 2001.

Suzanne M. Schweigert, Smith, Bakke, Hovland & Oppegard, Bismarck, ND, for debtor.

### MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The Debtors, Steve J. and Diane Szudera ("Szudera"), filed this, their second Chapter 12 case on May 31, 2001, just hours following the dismissal of their previous Chapter 12 case (Case No. 99–31270) which had been dismissed because of a default in the terms of a confirmed plan. Presently the Szuderas seek confirmation of a First Modified Plan under Chapter 12 ("Modified Plan") filed on October 29, 2001. The original plan filed in the instant case was met by numerous objections, all of which have been resolved by the Modified Plan save for those of the largest single creditor, Great Plains National Bank ("Great Plains"). Failing to receive payments under the confirmed plan in the Szuderas' previous Chapter 12 case, Great Plains moved for dismissal of that case which led to a post-confirmation stipulation allowing them further time to make the payment. This stipulation provided for immediate and automatic entry of an order of dismissal should the payment not be made within the extension period. Finding the Debtors to be in breach of the plan as well as the stipulation, the Court entered an Order of Dismissal on May 10, 2001.

Great Plains objects to confirmation of the Modified Plan now at issue on multiple grounds. It charges that as the Modified Plan is not significantly different from the one breached in the former case, it is not feasible and its filing is in bad faith. It further objects on the grounds that the Modified Plan favors or improperly treats certain claims, that it undervalues or entirely omits Great Plains' interest in certain collateral, that it fails to treat a non-dischargeable debt and that during the pendency of the former Chapter 12 case the Szuderas created a corporation and transferred assets into that corporation for the purpose of evading creditors.

In conjunction with raising plan objections, Great Plains filed a motion for dismissal of the instant Chapter 12 case challenging reorganization feasibility and additionally arguing that the schedules and statement of affairs are inaccurate and designed to mislead creditors.

Confirmation of the Modified Plan as well as the motion to dismiss came on for hearing on October 29, 2001, and both were taken under advisement with the evidence presented bearing upon both matters.

## FACTUAL BACKGROUND

### 1.

### Income Projections

The Szuderas reside in the town of Beach, North Dakota and since May 18, 2001, operate a farming enterprise under the name of Szudera Farms, Inc. through which they own six hundred forty acres of farmland and several parcels of city property. For the year 2002, they project planting 3,448 acres of owned and rented land to small grain, sunflowers, corn and beans with total crop sale income projected at $456,110.00. In addition to farm related income, they earn $25,500.00 off farm bringing their total projected income to $512,035.00 for the year 2002. Projections for future years are essentially the same.

Current year crop income projections provided in connection with confirmation of the plan in their previous, and now dismissed, Chapter 12 case projected crop income at $613,840.00 with total income for the year 2001 projected at $777,172.00. Current year projections provided in conjunction with the Modified Plan now under consideration projects crop income for 2001 at $339,107.00–a 55% reduction from the projections offered in connection with the former Chapter 12 case. In fact, 2001 yields were far below previous projections. Durum was projected at 18 bushels per acre and only 15 bushels per acre were realized. Sunflowers were projected at 800 pounds per acre and only 400 pounds per acre were realized. Dry beans were projected at 1,000 pounds per acre and only 100 to 300 pounds per acre were realized. Similarly, actual results in 1999 were far below projections for that year. In that year the Debtors anticipated total farm income to be $444,844.00 yet the trustee's report for 1999 revealed actual gross farm income to be $275,365.00. Nonetheless, Steve Szudera testified that the projections offered in connection with the present Modified Plan under consideration are taken from past history and experience and that the yield problems in 2001 were caused by weather and marketing difficulties. He said his cash flow projections are accurate. No other testimony was offered on this point nor was there any testimony offered to dispute the accuracy of these projections other than projections and trustee reports provided in the previous Chapter 12 case (Case No. 99–31270) which the Court takes judicial notice of. In any event, if accurate, the new projections made in connection with the present Modified Plan suggest there to be available $345,725.00 for plan payments in the year 2001, $122,313.00 available for the year 2002 and $118,022.00 for the year 2003. These amounts would be sufficient to fund all payments provided for under the Modified Plan, assuming the treatment being proposed to the various creditors otherwise conforms to the requirements of Chapter 12.

Although the new projections for 2001 provided in connection with the Modified Plan show $335,300.00 available for payments to creditors, only $16,783.00 is actually being paid in consequence of the treatment accorded creditors under the Modified Plan. Three hundred eighteen thousand five hundred sixteen dollars ($318,516.00) is shown as having been previously paid out to creditors pursuant to the plan confirmed in the previous Chapter 12 case but in that case, no payments were made to Great Plains despite the fact that that plan required a payment of $33,544.00 in 2001. Thus, the Debtors' farming operation could not cash flow in its previous interation. Full payments under the modified plan now under consideration do not begin until 2002 and assuming income and expense projections, the amount of the claims, and treatment meet

Chapter 12 requirements, their farming operation generates a cash flow that will just barely meet plan payments. Consistent with the Modified Plan provisions, the Szuderas will need $117,180.00 to fund the plan in 2002 and in that year according to the projections, they will have $122,313.00 available. As one can see, there is no margin for error in either the net disposable income projections or in claim treatment.

2.

### Proposed Treatment of Great Plains

Great Plains has filed a Proof of Claim in the amount of $412,965.00 in consequence of a 1998 operating loan of $442,000.00, a 1999 operating loan of $25,000.00, a 1998 business debt refinance loan of $29,750.00, and a $10,000.00 purchase money loan for the purchase of a John White Hopper Bottom Trailer. Documents received into evidence establish that Great Plains was granted a real estate mortgage in all property situated in Beach, North Dakota and in 18.4 acres of farmland. It was also granted a blanket security interest in all equipment, machinery, vehicles, fixtures, shop equipment, parts and tools, and all crops growing in the years 1998 and 1999. Additionally, it was granted a specific security interest in a John White 34' Hopper Bottom Trailer. (Exhibits 2, 7, 8 and 9). In the previous Chapter 12 case the confirmed plan recognized Great Plains as having a secured claim in real property, farm machinery, equipment, tools, 1998 crops and CIH Combine. The petition schedules assigned a value to Great Plains' claim of $376,527.00, this being the scheduled value of the real estate and personal property. The machinery, tools, equipment and camper alone were valued at $317,000.00.

The Modified Plan, now under consideration, as well as the schedules filed in connection with the present Chapter 12 case has placed a value of $175,000.00 on the machinery, tools, equipment, and camper. The Modified Plan specifically denies that Great Plains has a security interest in either the 1998 crop or the CIH combine, both of which were formerly recognized as having a value in the aggregate of $75,000.00. The previous confirmed plan amortized the real estate claim over twenty years at 9.5% with a balloon after five years. The chattel claim was to be amortized over 10 years at 9.5% with a balloon at the end of five years. The treatment being now accorded Great Plains is significantly changed by the Modified Plan and as a result the payment under the plan to Great Plains is reduced from $33,544.00 to $14,074.00. This has been accomplished by proposing the surrender of several parcels of real property valued at $14,920.00 thereby reducing Great Plains' claim secured by real property and by also proposing the surrender of eight pieces of equipment which have been assigned a value of $35,695.00. The plan lists fourteen other vehicles and items of equipment which Szuderas intend to retain and to which they assign an aggregate value of $50,590.00. Thus, under the Modified Plan, the value of Great Plains' interest in machinery, tools and equipment entitled to secured treatment is $50,590.00. The Modified Plan does not specifically recognize Great Plains as having an interest in the John White Trailer and is completely devoid of any information tending to support the values placed upon the chattels being either retained or surrendered.

At trial, Steve Szudera stated that he and his wife transferred certain items of equipment to Szudera Farms, Inc. and that this property, although listed as assets in the previous Chapter 12 case, have not been included in the present case. The current statement of affairs omits any mention of this event and it is not clear

precisely what items were transferred or what their value is. The Modified Plan makes no reference to this change in ownership and affords no explanation as to how the debt against this equipment will be paid.

No payments at all are provided to Great Plains in the first year of the Modified Plan until the second year (2002) when the payment is $14,074.00.

The reduced real estate and chattel claims are also assigned a reduced interest rate of 7% which is the same rate afforded other secured creditors. From this, Steve Szudera opined that it was a fair rate. Disagreeing, the vice president of Great Plains testified that the bank never offers loans with a 100% loan to value ratio which this would be and would never grant a ten year term on a chattel loan to anyone. Given the Szudera's credit quality and attendant risk, he said that 9% would be appropriate for secured debt and even if an unsecured loan were available, it would carry a rate of not less than 10.5%.

### 3.

#### Bernice Szudera Claim

Steve Szudera's mother, Bernice Szudera, has apparently provided the Debtors with operating funds but the precise amount of these funds is not altogether clear. At the hearing Steve Szudera testified that he borrowed $55,000.00 from his mother and that it was secured by a crop lien. Subsequently, in Szuderas' post-petition brief the amount is claimed to be $91,961.00 secured not only by a crop lien but by machinery and equipment. Whatever the amount is, if anything, there is no proof that it is secured. In fact, Bernice Szudera does not appear in the bankruptcy schedules as having any claim either secured or unsecured for operating funds. Nonetheless, in the projected plan payments for the year 2001 and beyond she receives payments as a secured creditor and these payments factor into the plan distribution.

### DISCUSSION

#### 1.

■ The burden rests with the Szuderas, as plan proponents, to establish all of the elements essential to confirmation under Chapter 12. The first six requirements, set forth in Section 1225(a) apply in every case and one more additional requirement set forth in Section 1225(b) applies in cases where either the trustee or holder of an allowed unsecured claim has objected. In consideration of the Modified Plan now being advanced for confirmation and the unresolved objections lodged by Great Plains, the Court will focus its discussion upon several of these.

■ The overarching requirement, of course, is that the plan be "feasible," a requirement found in Section 1225(a)(6) which provides that a plan may be confirmed only if "the debtor will be able to make all of the payments under the plan and to comply with the plan." This test, common to Chapter 13 and Chapter 11 cases as well as Chapter 12 cases, requires a court to carefully scrutinize the proposed payments in light of projected income and expenses and consider whether they are based upon realistic and objective facts and whether they are capable of being met. *In re Alvstad*, 223 B.R. 733, 745 (Bankr.D.N.D.1998); *In re Foertsch*, 167 B.R. 555, 565 (Bankr.D.N.D.1994). The issue of feasibility, premised as it is upon projections and amounts available for payment of claims, cannot be considered without also considering whether all claims are properly provided for in a manner consistent with the requirements of Section 1225(a) and Section 1225(b). Feasibility of Szuderas' Modified Plan is fully dependent upon a finding that as regards the claim of

Great Plains, all other elements of Section 1225(a) have been met. This is where Szuderas fall into the proverbial bramble bush.

## 2.

■ The first difficulty comes to light in connection with Section 1225(a)(5)(B)(i) which requires that a plan provide the holder of an allowed secured claim retention of the lien securing such claim. *In re Hanna*, 912 F.2d 945 (8th Cir.1990). The evidence produced at the hearing together with the filed proof of claim establishes that Great Plains has a security interest in a John White Hopper Bottom Trailer valued at $10,000.00, a combine and crops together valued at $75,000.00 which although conceded to in the previous Chapter 12 case, are not only not provided for in the present plan but are completely disputed. Essentially, Szuderas are attempting to invalidate Great Plains' security interest in this property through the confirmation process. Neither Section 1225 nor the Federal Rules of Bankruptcy Procedure continence such a method of lien avoidance. *Cen–Pen Corp. v. Hanson*, 58 F.3d 89 (4th Cir.1995), *see* 5 *Collier on Bankruptcy*, ¶ 7001.03[1](Lawrence P. King ed., 15th ed. rev.1992). A debtor may not ignore, avoid or challenge a secured creditor's lien through the confirmation process unless the issue has been first determined through an adversary proceeding seeking a determination of the validity, priority or extent of lien. *See* Rule 7001(2) Fed. R. Bankr.P.; *In re Kressler*, 252 B.R. 632 (Bankr.E.D.Pa.2000). Here, Szuderas have put the proverbial cart before the horse by first seeking to confirm a plan which makes no provision for secured treatment of the foregoing items and which they hope will later be avoided in post-confirmation proceedings. Notwithstanding this hope, claim treatment and the cash flow projections must, in the first instance, make provision for these claims and they do not.

## 3.

■ Under Section 1225(a)(5)(B)(ii) a nonconsenting holder of an allowed secured claim must, in addition to retaining its lien, receive property having a present value not less than the allowed amount of the claim. What this means is that the Modified Plan, in addition to preserving Great Plains' liens, must provide it with a stream of payments which has a present value equal to the allowed amount of the claim. "Present value" is calculated by first determining the value of the collateral securing the claim and then applying a discount rate in the form of interest payments. *In re Foertsch*, *supra*, at 563; *In re Shady Grove Tech Center Assocs.*, 216 B.R. 386 (Bankr.D.Md.1998). Great Plains believes their collateral has been undervalued and that 7% is not reflective of a market rate of interest. The facts are unclear as to precisely what caused a devaluation of Great Plains' collateral from $317,000.00 in the previous Chapter 12 case to $175,000.00 in the present case. Apparently some of the property has been either sold, transferred or paid off and for that reason is no longer reflected in the current schedules. Whatever the reason, it is by no means clear to the Court that the new values assigned to Great Plains' collateral are accurate. Moreover, the offered interest rate of 7% is not representative of the market rate of interest. The only credible evidence bearing upon what a market rate of interest is was that offered by Great Plains. Its witness opined that given the Debtors' credit quality, at best they could expect 9% in the current market. In this circuit the most appropriate interest rate is the current market rate for similar loans made in the region at the time. *United States v. Doud*, 869 F.2d 1144

(8th Cir.1989); *In re Foertsch, supra; In re Rott,* 94 B.R. 163 (Bankr.D.N.D.1988); *In re Fenske,* 96 B.R. 244 (Bankr.D.N.D. 1988); *In re Claeys,* 81 B.R. 985 (Bankr. D.N.D.1987); *see also In re Howard,* 212 B.R. 864 (Bankr.E.D.Tenn.1997). The proposed treatment of Great Plains' claim does not protect the value of its interest in the collateral.

### 4.

 Even under the most optimistic of scenarios, the Szuderas must outperform their historical 1999 and 2001 experience and, aside from any bad faith considerations, their farm operation must generate sufficient cash flow to satisfy the requirements of Sections 1225(a)(5)(B)(i) and (ii). The plan must allow for payment of Great Plains' claim secured by crops, the CIH combine and the John White Hopper Bottom Trailer—a claim which may, without evidence to the contrary, be said to be $85,000.00. It must provide an interest rate of at least 9% to this debt and to all other Great Plains' secured debt. Even assuming the Szuderas' other collateral values are correct, this means the plan must cash flow $85,000.00 over five years at 9%. This will require an additional payment of $21,850.00 per year. Using a 9% interest rate for the retained equipment (assuming the Szuderas assigned market value of $50,590.00 is correct) increases the annual payment from $12,338.43 to $13,006.31. Applying 9% as well to the retained real estate valued at $12,197.00 and amortized over ten years increases the annual payment from $1,736.58 to $1,900.54. These adjustments require an additional $22,682.00 per year. Even if cash flow projections for the years 2001, 2002, and 2003 are accurate, which the Court thinks doubtful, these increased payments cannot be made. The Modified Plan, even under the most optimistic of scenarios will not cash flow. If one allows for a margin of error in recognition of the Szuderas actual experience in 1999 and 2001, the picture becomes far worse.

### 5.

 While the Modified Plan fails by virtue of the foregoing analysis, the matter of good faith ensconced in Section 1225(a)(3) will be briefly discussed as it is another of the grounds raised by Great Plains for denying confirmation. Section 1225(a)(3) requires that for confirmation the plan must have been proposed in good faith and not by any means forbidden by law. Recently the Bankruptcy Appellate Panel for the Eighth Circuit has said that as regards this requirement, a court must examine the totality of the circumstances and give consideration to whether the debtor has unfairly manipulated the Code. *In re Barger,* 233 B.R. 80 (8th Cir. BAP 1999). This requirement draws several comments. First of all, with respect to the favored treatment being accorded Bernice Szudera, there is a matter of fairness to be reckoned with. In Chapter 11 cases there is a requirement that senior creditors are entitled to payment before any junior creditor receives payment or retains property. This requirement is called the "absolute priority rule" and forms a component of the "fair and equitable" requirement necessary for confirmation of Chapter 11 plans. *See* 11 U.S.C. § 1129(b)(2)(C)(ii). Chapter 12 confirmation requirements do not contain a statutory fairness component but nonetheless, many courts in reviewing Chapter 12 plans, impose a fairness component as regards treatment being proposed for various claimants. Great Plains argues that the favored treatment being accorded Bernice Szudera places her, as a creditor with an unsubstantiated claim, ahead of Great Plains, a secured creditor. This treatment, charges the bank, is evidence of

bad faith. This Court agrees. Moreover, of even greater concern is the fact that the present Chapter 12 case being the second one filed, was filed on the very heels of a prior Chapter 12 case which was dismissed because a confirmed plan was in default. This raises a concern because in the previous case, when Great Plains' claim was assigned a higher collateral value and greater discount rate, Great Plains did not receive a single payment and now, after Szuderas have had the benefit of not one but two Chapter 12 cases and have been under protection of the Bankruptcy Code for two and one-half years, Great Plains finds it claim reduced, the value of its collateral reduced, and the proffered plan payments in recognition of its claim also severely reduced. Courts traditionally look askance at repetitive filings in a short period of time and many courts believe them to be an abuse of the Bankruptcy Code. *In re Russo*, 94 B.R. 127 (Bankr. N.D.Ill.1988); *In re Jackson*, 91 B.R. 473 (Bankr.N.D.Ill.1988). It is easy to see how through repeated serial filings a wile Chapter 12 debtor could winnow the value of a secured creditor's claim down to practically nothing as the valuation is typically established as of the date of petition filing. Thus, when a debtor is unable to meet the terms of a confirmed plan and the case is therefore dismissed, the affected debtor, rather than appeal the order of dismissal, simply files a new Chapter 12 petition and in the course of which, is able to reduce or perhaps even eliminate the claim originally established in the dismissed case. The legislative history of Chapter 12 suggests that Congress intended Chapter 12 cases to move along expeditiously so as to protect a creditor's interest and to preclude diminution in the value of collateral if a reorganization cannot be achieved. *See In re Pretzer*, 96 B.R. 790 (Bankr.N.D.Ohio 1989), citing 132 Cong. Rec. S, 15075 (Oct. 3, 1986)(statement of Sen. Grassley). In the case at bar the Szuderas were given a previous opportunity to present a feasible Chapter 12 plan in their first case but despite being given every opportunity and despite a stipulated extension of time within which to make payment on the defaulted payment, they breached the plan. The present Modified Plan under consideration affords them no greater hope for a successful reorganization than did the plan in their previous, and now dismissed, Chapter 12 case. The Court believes, given the circumstances, that it was an abuse of the bankruptcy process for the Debtors to immediately re-file a Chapter 12 case and present yet another problematical plan and to do so constitutes a lack of good faith. It is the belief of this Court that creditors should not be re-exposed to the burdens and costs that inevitably arise in a completely new bankruptcy case and this Court takes a critical stance towards maneuvers or schemes which have the effect of completely avoiding the terms of a confirmed plan and effectively eliminating the value of a secured creditor's claim in the process.

For the foregoing reasons, confirmation is **DENIED**. The Motion by Great Plains National Bank for dismissal of this Chapter 12 case is **GRANTED**. The case is hereby **DISMISSED**.

**SO ORDERED.**