**In re DARRELL CREEK ASSOCIATES, L.P., Debtor.**

Civ. A. No. 95–71263.

United States Bankruptcy Court, D. South Carolina.

July 28, 1995.

Stanley H. McGuffin, Columbia, SC, for Wachovia Bank of S.C., NA.

G. William McCarthy, Columbia, SC, for Debtor.

## AMENDED ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER comes before the Court upon the Motion of Wachovia Bank of South Carolina, N.A. ("Wachovia") to Find Stay Inapplicable, or Alternatively for Relief from the Automatic Stay, filed April 14, 1995 ("Motion for Relief from the Automatic Stay"); and the Motion of Darrell Creek Associates, L.P. ("Debtor") for Sale Free and Clear of Liens Pursuant to 11 U.S.C. § 363 [1] and For Use of Cash Collateral and Authority to Hold Additional Proceeds subject to Further Order of this Court, filed April 26, 1995, ("Motion to Sale Free and Clear of Liens").

After consideration of the pleadings before the Court, testimony of the witnesses and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Debtor filed a petition under Chapter 11 of the Bankruptcy Code on March 10, 1995.

2. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and 11 U.S.C. §§ 362 and 506. This is a core proceeding.

3. Debtor is a debtor-in-possession.

4. Debtor is a South Carolina general partnership in which the general partner is Island Land Company, a South Carolina General Partnership. The general partners of Island Land Company are Samuel Logan, Jr. ("Logan") and Anthony R. McCreight ("McCreight").

5. Wachovia has filed two (2) claims against the Debtor in the amount of approximately $2,595,793.65 and $217,080.69. As collateral for the claims, Wachovia holds mortgage liens against real property located in Charleston County, State of South Carolina, known commonly as "River Station" and formerly known as "Darrell Creek Plantation".

6. River Station is a residential subdivision containing approximately 70 residential lots [2] presently developed for sale and approximately 224 remaining undeveloped acres. The subdivision has completed infrastructure consisting of public water, public sewer and some public roadways to serve the 70 lots.

7. Debtor has filed an objection to the Motion for Stay Relief. There were also objections in the form of letters directed to the Court by several unsecured creditors. Counsel for Wachovia advised the Court that he only recently learned of these objections, the objections had not been served upon him in accordance with the requirements of the Notice of Motion and also that the objections

---

1. Further reference to the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* shall be by section number only.

2. The exact number of available lots is unclear due to some lots apparently being reserved for settlement of pending litigation concerning title to the property.

did not appear to be timely filed pursuant to the Local Rules of this Court. None of the persons or entities which filed the letter objections appeared at the hearing to prosecute their objections. The Court also notes that there are no filed certificates of service to indicate that counsel for Wachovia was served with these letter objections.

8. The United States Small Business Administration ("SBA"), Wachovia and the Office of the United States Trustee, each filed objections to Debtor's Motion to Sell Free and Clear of Liens.

9. On April 27, 1993, Debtor and Wachovia executed an agreement entitled "Workout Agreement". This Agreement essentially restructured the terms and conditions of two notes of Debtor to Wachovia which originated in 1990 and were in default. These notes and the Workout Agreement now form the basis of Wachovia's filed claims. The Workout Agreement was the result of negotiations between the parties which began sometime in late 1992. Both parties were represented by counsel during negotiations and in the preparation of the Workout Agreement.

10. The Workout Agreement imposed various obligations upon and required various concessions from the Debtor and from Wachovia. Among the obligations imposed upon Debtor was the requirement to deposit $400,000 into an escrow account which funds were designated for completion of the subdivision infrastructure and other related expenses of Debtor. Under the terms of the Agreement, Wachovia agreed to allow the Debtor to use as working capital the proceeds from the anticipated sale of three specific lots, which the parties estimated would generate approximately $177,120. (Article 9.1 of Workout Agreement). Wachovia also agreed to modification of the payment obligations under the notes and extended the maturity dates on the notes to August 31, 1996. Of the three lots that Wachovia agreed to allow to be contributed to the working capital of Debtor, only one lot eventually sold. Debtor obtained contracts on the remaining two lots, but was not able to consummate the sales because of problems associated with the readiness of the development.

11. Article 11.7 of the Workout Agreement contained language commonly referred to as a "waiver of the stay" and provided in relevant part as follows:

BORROWER AND EACH GUARANTOR AGREE THAT IN THE EVENT OF A VOLUNTARY OR INVOLUNTARY LIQUIDATION OR REORGANIZATION CASE BY OR AGAINST THE BORROWER UNDER BANKRUPTCY, RECEIVERSHIP OR OTHER INSOLVENCY LAW, THAT BANK SHALL BE FREE TO PURSUE FORECLOSURE AND OTHER REMEDIES WITH RESPECT TO THE COLLATERAL ENCUMBERED BY THE MORTGAGE (THE "COLLATERAL"), WITHOUT OPPOSITION OR INTERFERENCE BY THE BORROWER, THAT BANK SHALL BE ENTITLED TO SEEK AND OBTAIN RELIEF FROM THE AUTOMATIC STAY UNDER SECTION 362 OF THE BANKRUPTCY CODE WITHOUT OBJECTION BY THE BORROWER OR GUARANTOR, AND THAT ANY RIGHTS TO STAY, ENJOIN, OR OTHERWISE DELAY OR IMPEDE THE LENDER'S REMEDIES AGAINST THE COLLATERAL, INCLUDING FORECLOSURE, WHICH MIGHT BE AVAILABLE TO THE BORROWER, OR THE GUARANTOR, INCLUDING ANY RIGHTS UNDER SECTIONS 105 AND 362 OF THE BANKRUPTCY CODE, ARE HEREBY RELEASED AND WAIVED (HEREINAFTER REFERRED TO AS THE "WAIVER–OF–STAY") BY BORROWER AND GUARANTOR.

Article 11.7 was typed in all capital letters and bold print within the Workout Agreement.

12. The signature page of the Workout Agreement also contained directly above the signature of Debtor the following provision typed in all capital letters and bold print:

WE ACKNOWLEDGE THAT THIS AGREEMENT CONTAINS A COMPLETE RELEASE OF CLAIMS AND WAIVERS OF CERTAIN RIGHTS, A GRANT OF SECURITY INTEREST, AND THAT WE HAVE READ AND UN-

DERSTOOD THE AGREEMENT IN ITS ENTIRETY PRIOR TO SIGNING.

13. Debtor, through at least one of its principals, Logan, directly participated in the negotiations on the terms of the Agreement, discussed the Agreement with its counsel and was given ample opportunity to review the Workout Agreement prior to it being executed. Logan testified that he did not fully understand Article 11.7, but that he never raised any objection to nor requested further explanation of the waiver of stay provision of the document.

14. Prior to the execution of the Workout Agreement and based upon the default of the notes, Wachovia had commenced an action on Guarantees against Logan and McCreight. Upon the execution of the Workout Agreement, this action on Guarantees was dismissed.

15. Logan is, by his own testimony, a well educated, experienced and sophisticated real estate developer.

16. Subsequent to the execution of the Workout Agreement on April 27, 1993, and prior to execution of the amendment to the Workout Agreement on November 23, 1993, the parties learned that the water and sewer lines within River Station were apparently damaged severely by a utility contractor installing telephone lines. The damage to the lines caused a series of delays in the completion of the initial phase of the subdivision and caused the Debtor to incur substantial costs for repairs to the water and sewer lines. Debtor was successful in having the repairs completed by late spring or early summer of 1994. Debtor has filed a state court civil action against various parties, including Bell South, allegedly liable for the losses resulting from the damage to the water and sewer lines. According to the Debtor, there have not yet been any offers from the defendants to settle that action to date.

17. In addition to the default on the Wachovia loan, the Debtor faced other legal problems including lawsuits alleging defects in the title to portions of the subject property.

18. As a result of the various delays in completing River Station, Debtor was not able to comply with some of the deadlines established by the Workout Agreement. Debtor was also required to use some of the $400,000 escrow funds for payment of repair costs rather than construction completion and related expenses as originally designated in the Workout Agreement.

19. These delays and expenses necessitated Debtor requesting additional funds from Wachovia and further extensions of deadlines in the Workout Agreement to complete construction of River Station. In response to these requests, Wachovia agreed to several extensions of time to complete construction and eventually established March 15, 1994 as the deadline for completion of the development of River Station.

20. Wachovia also agreed to allow Debtor to use two of the lots within River Station, without payment of any release fee to Wachovia, to facilitate the settlement of a civil action between Debtor and Kathryn S. Cowart and Robert D. Cowart ("Cowart Litigation").

21. In August of 1994, Wachovia was again contacted by the Debtor with a request to provide additional time and operating funds through the release of additional lots, both necessary to complete the development. After a review of this request, plus a budget of anticipated expense prepared by Debtor, Wachovia determined that it would have to provide even more funds or lot releases than those requested by Debtor. Consequently, Wachovia denied these requests of Debtor for additional funds or extensions.

22. Due to the defaults by Debtor under the Workout Agreement, Wachovia then elected to accelerate its indebtedness and demanded payment from Debtor pursuant to the terms of the Workout Agreement. When Debtor did not comply with this demand, a state court foreclosure action was instituted by Wachovia against Debtor.

23. A majority of the developed lots in River Station and all the undeveloped acreage were sold by taxing authorities in 1994 for delinquent *ad valorem* taxes for prior years. In order to prevent the tax sale from becoming final, the lots and acreage must be redeemed by July 5, 1995 ("tax redemption

date"). The total redemption fee that must be paid by July 5, 1995 is approximately $90,429.

24. Debtor has not been successful in raising the funds to pay the delinquent taxes. Logan acknowledged that the general partners and the limited partners of the Debtor were presently either not willing or not able to contribute the funds to pay the taxes or any of the other expenses associated with the operation and marketing of River Station or the performing of the repair work currently needed in the subdivision. He conceded that although Debtor was seeking other sources of financing, the only current available source of funds was through liquidation of the real estate, which is Wachovia's collateral.

25. Debtor does not presently have any contracts of sale on lots or undeveloped acreage and does not believe that it can obtain and close enough contracts to generate sufficient funds to pay the delinquent taxes prior to the tax redemption date. Consequently, it has requested that Wachovia advance the funds necessary to pay the delinquent *ad valorem* taxes.

26. Through Logan's testimony, the Debtor acknowledged that Wachovia did not violate any of its duties or obligations under the Workout Agreement prior to its acceleration of the indebtedness.

27. Debtor has not yet filed a plan of reorganization. However, Debtor indicated an intention to file a plan within the exclusivity period which terminates on or about July 10, 1995. Debtor anticipates that through a plan of reorganization it will be able to sell enough lots and undeveloped acreage over a period of three years to provide payment in full of Wachovia's claims. Under the Debtor's operation projection, the majority of net proceeds from the sale of the first several lots would have to be retained by the Debtor for essential operating costs and start-up marketing expenses.

28. SBA is the holder of a mortgage lien on the subject property subordinate to the liens of Wachovia. There are also subsequent judgment, mechanics, and tax liens against the subject property and sewer and water fees owed.

29. Based upon the testimony of Debtor, and experts in the area of real estate appraisal presented by both Debtor and Wachovia, the Court finds there is currently no equity in the subject real property exceeding the liens held by Wachovia.

## CONCLUSIONS OF LAW

One of the primary issues raised in this case is that of the enforceability of the waiver of stay contained in the Workout Agreement. This issue has been previously addressed by this Court's ruling in *In re Cheeks,* 167 B.R. 817 (Bankr.D.S.C.1994) (WTB). As in the case at hand, *Cheeks* dealt with a pre-petition workout agreement regarding the stay, commonly referred to as a "waiver of stay" agreement. In *Cheeks,* Judge Bishop held that the pre-petition waiver of stay eliminated the debtor's standing to object to a request for relief from stay in that case. However, the Court's ruling recognized that the waiver may not be binding on third parties and therefore such parties may have standing to object to relief from stay. In such an event, the Court in my view implied an intention to examine other factors related to a finding of cause to constitute a relief from stay; including but not limited to whether there is equity in the property, and whether there is a likelihood of a successful reorganization. Additionally, at the citation of the Debtor, this Court has considered and relied upon *In re Powers,* 170 B.R. 480 (Bankr.D.Mass.1994). In *Powers,* the Court found that pre-petition agreements containing waivers of stay are not automatic or self executing. *Powers,* at p. 483. A pre-petition agreement involving a waiver is a primary element in determining if cause exists for relief from the stay. Once the pre-petition waiver has been established, the burden is on opposing parties to demonstrate that it should not be enforced. *Powers,* at p. 484. In *Powers,* the Court examined such factors as the benefit the debtor received from the workout agreement, the loss of consideration or potential prejudice to the creditor if waiver is not enforced, the effect of enforcement on other creditors and whether there appears to be a likelihood of a successful reorganization. In order to thoroughly examine these

issues in the case at hand, this Court now applies the holdings of the *Cheeks* and *Powers* decisions.

■ From *Cheeks,* the first determination is whether the effected party understood the terms and consequences of the waiver of stay. Here, it is clear to this Court that the Debtor understood or should have understood the waiver of stay. The principal of the Debtor testified that this Agreement was negotiated over a very long period of time and that it was an active negotiation. Further, he testified that he made comments on certain provisions through the course of this negotiation. Clearly, the evidence is undisputed that during at least a portion of these negotiations, the Debtor was represented by counsel. The Debtor's principal was by his own testimony a sophisticated real estate developer who had great experience in this area. The language of the waiver of stay is clear, and is clearly and conspicuously disclosed in the Workout Agreement. Debtor, through its principals Logan and McCreight, acknowledged in the Workout Agreement that they had read and understood its terms. In this Court's view, it was not reasonably possible for Wachovia to more fully ensure that the Debtor, through its principals, understood the waiver of stay and its effect. The Debtor understood the waiver of stay, or should have understood it. The Court does not find any credible evidence to the contrary.

■ The next important proposition considered in *Cheeks* is that a waiver of stay is different from, and not equivalent to, a waiver of the right to file bankruptcy. Pre-petition agreements, such as the waiver of stay agreement in this case, are enforceable in bankruptcy. *Cheeks* at p. 818, 819, citing *In re Club Tower L.P.,* 138 B.R. 307 (Bankr. N.D.Ga.1991). Here, the Debtor was not forced to sign the waiver of stay. Although Debtor argues that it was essentially forced to sign the Agreement due to a lack of bargaining power, the Debtor had at least one other choice which it chose to forego, that being to file bankruptcy then rather than enter into the waiver of stay. The evidence shows that the Debtor knowingly and voluntarily entered into the waiver of stay in order to obtain more time to develop the project, which it in fact did obtain, from 1993 to 1995.

A further factor considered by the Court in *Cheeks* is whether there was some surrender of rights by the lender in regards to the giving and receiving of the waiver of stay. *Cheeks,* at p. 819. As more fully set forth in the Findings of Fact, Wachovia extended various concessions to the Debtor as part of the Workout Agreement and even after the Agreement was finalized, further aided the Debtor in an effort to help it overcome the problems caused by the damage to the water and sewer lines. Among the consideration extended was that Wachovia agreed to contribute substantial resources through release of its collateral. Wachovia also dismissed a civil action then pending against Logan and McCreight seeking recovery against them as guarantors of these loans to Debtor.

■ Judge Bishop found it important in *Cheeks* that public policy encourages out of court restructuring. Here, the Workout Agreement reveals that Wachovia and Debtor considered numerous problems facing Debtor at the time of the Agreement (and subsequently through extensions) and not merely the default status of the Wachovia notes. Article VIII of the Workout Agreement specifically addresses eleven situations involving creditors or pending legal actions, such as the Cowart Litigation, which needed to be resolved by Debtor and, in some instances, addressed how and when Debtor intended to resolve such problems. As stated previously, Debtor could have elected not to pursue negotiating or signing the Workout Agreement. However, it apparently weighed the benefits and burdens of the Agreement against the possible advantages and burdens of filing a Chapter 11 petition in 1993 and elected to pursue the out of court restructuring and settlement. Unfortunately, circumstances later developed that did not allow the Debtor to meet these expectations or comply with the Agreement. However, this Court agrees with the holding in *Cheeks,* that such out of court workouts are to be encouraged and are often effective.

■ Debtor argues that due to subsequent events the Workout Agreement should be invalidated on the theory of mutual mistake. The Court does not accept this argument.

At the time the Workout Agreement was executed, neither party was apparently aware of the water and sewer problems. However, real estate development on such a scale is a speculative venture and is often subject to numerous unforeseeable circumstances and events. No Workout Agreement could contemplate all such possible problems. In this Court's view, such workout agreements should not be generally avoidable because of unforeseen or unknown development problems. In this case, while the Debtor asserted that it, in hindsight, may not have entered into the Workout Agreement had it known of those problems, there was no sufficient evidence to indicate that Wachovia took the same position. Despite the water and sewer problems, the Workout Agreement provided benefits to this Debtor. Under the facts of this case, the Court does not believe that the occurrence of the water and sewer system problems overrides the factors which favor enforcement of the waiver of stay provision in the Workout Agreement.

Debtor also originally raised in its pleadings an allegation that Wachovia violated its obligations under the Agreement as grounds for not enforcing the waiver of stay. However, Logan testified that up until the time Wachovia elected to accelerate its debt due to Debtor's failure to abide by the terms of the Agreement, Wachovia had complied with the Agreement in full. Therefore under the terms of the Agreement, Wachovia was entitled to accelerate.

Another factor set forth in the *Cheeks* and *Powers* cases which this Court has considered is the effect of stay relief on other creditors and their objections, if any, to the motion. The Court has considered the objections filed by various unsecured creditors, even though they did not appear to substantiate their objections. These objections are what the Court can characterize as "only hope objections," in which the creditor essentially sets forth that their only hope of getting paid is through allowing the bankruptcy case to go forward to a possible reorganization. These objections did not set forth with particularity any assertions of equity or facts indicating a likelihood of successful reorganization. Although some of the objections were by creditors owed relatively small amounts, at least one was from an attorney for a creditor and at least one of those creditors had a claim in the $100,000 to $200,000 range. It would seem that such claims would warrant the presence of these objecting creditors at the hearing before the Court. Since these parties did not appear to further prosecute and support their objections and based on their lack of particularity in nature, these objections are overruled. The Court has noted that the SBA as the holder of a junior lien on the property did appear at this hearing and asserted that it favors the relief requested by Wachovia because it has concluded that the Debtor has very little likelihood of reorganization.

Notwithstanding the foregoing conclusions which under the *Cheeks* decision would allow for granting relief from the stay, the Court in following the reasoning of the *Powers* decision, also carefully considered the testimony as it related to the general chances of Debtor to successfully reorganize. The standard to be applied in these circumstances is whether the Debtor has a realistic possibility of an effective reorganization. In the Court's view, such was not shown in this case. An effective reorganization in this case is totally dependent upon achieving sales of lots and undeveloped acreage within an accelerated amount of time. Such sales are presently the only realistic source of funds to pay creditors and provide operating capital. In the Court's view, the possibility of lot sales at the rate and prices that Debtor's principals project would be necessary to the Debtor's reorganization is highly speculative. The Debtor's projections forecast the majority of lot sales over a three year period, although both of the real estate appraisal experts presented by Debtor and Wachovia testified that a reasonable absorption rate of such lots would be within five or six years. Both experts generally opined that there was presently no ready market for the undeveloped acreage and that the undeveloped acreage would probably have to be held for at least five years before it likely would be economically feasible to develop it. In addition,

there are other significant problems also facing this real estate project.

Of immediate and primary importance is the expiration of the tax redemption period. Debtor admits that without direct and immediate financial assistance from Wachovia or another lending institution, it cannot redeem the project. The precedent in this jurisdiction is that § 362(a) does *not* toll the running of the tax redemption periods provided by S.C.Code § 12–51–90 (1976, as amended) when the period of redemption has not expired as of the date of the filing of the petition. *In re Cottage Farms*, 87–01784 (Bankr.D.S.C. 9/17/93) (JBD). Additionally, there are real estate title problems that impact the ability of Debtor to complete portions of the project. There are approximately $25,000 in roadway repairs necessary in order to convey some of the roadways to the county and there are delinquent sewer and water impact fees that will have to be paid from lot sales. Debtor admits, through Logan's testimony, that to overcome these obstacles and thereby "rejuvenate and stabilize the project" in order to market the property would be a great challenge. Based upon the testimony presented, this Court does not believe there is a realistic chance of the Debtor stabilizing the project and paying Wachovia or the other secured creditors, including SBA, at the rate proposed by Debtor or even at a rate necessary to provide the adequate protection mandated by the Bankruptcy Code.

As stated previously, one of the most critical problems facing the Debtor is that it does not have sufficient operating capital to deal with the many problems it faces and is now totally dependent upon the liquidation of Wachovia's collateral as a source of operating funds. There is no money forthcoming from general partners, limited partners or other banks, as testified to by Logan. There are not any current contracts for the sale of lots or acreage from which the Debtor could depend upon to provide immediate working capital.

Finally, the Court has also considered the ability of current management as a factor relating to the likelihood of an effective reorganization. Having heard the testimony of the principals of Debtor and considered the manner in which the principals have operated the Debtor from their initial efforts to raise capital from the inception of this real estate project partnership through its present circumstances, the Court is not confident that current management can address and overcome the problems now facing the Debtor within the necessary time frame. The resolution of such problems would require extraordinary management capabilities and tremendous efforts on the part of management and this Court is not satisfied that the Debtor presently has the management in place to accomplish such a task.

For all of these reasons, this Court concludes that the Debtor has not demonstrated that there is a reasonable likelihood of an effective reorganization. The many factors considered by the Court and discussed above have to be considered in the context of the level of protection afforded Wachovia by the value of the subject property. If this Court had been convinced that there was significant equity in the property, it would have given the Court great pause to grant relief from the stay for cause under § 362(d)(1) at this stage of the case. Debtor's expert testified that the property had a fair market value of approximately $3,700,000, while the expert for Wachovia testified that the property was worth approximately § 2,400,000. Although this Court considered all the testimony and written appraisals, it found the expert presented by Wachovia to be more credible and convincing and therefore the Court concludes that the Debtor has no equity in the property above the lien of Wachovia that would allow it to go forward with an effective reorganization under the circumstances of this case.

Lastly, this Court has also considered the balancing of hardship that would result from relief being granted from the stay in regards to this primary asset of the Debtor.[3] Under this consideration, the Debtor has attempted to make this project work since at least the early 1990's, without success. It has negotiated and attempted to implement an extensive out of court restructuring agreement. Wachovia and other creditors, including SBA,

---

**3.** While the Court is concerned about the impact of this decision as it relates to the possible distribution to unsecured creditors through a success-

ful Plan of Reorganization calling for the sale of lots over an extended period of years, this factor does not outweigh the harm to the secured credi-

have extended concessions or resources to Debtor in a concerted good faith effort to aid Debtor's attempts to make the project work for the benefit of all. However, any chance of further reorganization would require even greater concessions by Wachovia and other lenders and would necessitate that these lenders assume even greater risks associated with marketing this real estate project without any additional infusion of capital from the general or limited partners of Debtor. For these reasons, I conclude that the balance of potential harm is greater for these creditors than the Debtor.

## CONCLUSION

Based upon the foregoing, it is

**ORDERED,** that the Motion for Relief from the Automatic Stay is granted for cause pursuant to § 362(d)(1). It is further

**ORDERED,** that the Motion to Sell Free and Clear of Liens is denied.

**AND IT IS SO ORDERED.**

tors. This Court further notes that the litigation with Bell South and others may result in assets

for the benefit of other creditors.