## In re SHADY GROVE TECH CENTER ASSOCIATES LIMITED PARTNERSHIP, Debtor.

**Bankruptcy No. 97–2–0999–DK.**

United States Bankruptcy Court,
D. Maryland,
at Greenbelt.

Jan. 7, 1998.

David R. Kuney, Jeffrey L. Tarkenton, David, Hagner, Kuney & Davison, P.C., Washington, DC, for Debtor.

David Rice, Venable, Baetjer & Howard, Baltimore, MD, for Massachusetts Mutual Life Insurance Company.

Reed Sexter, Dicketein, Shapiro, Morin & Oshinsky, L.L.P., Washington, DC, for Diversified Investment Associates, Inc.

## MEMORANDUM OPINION

DUNCAN W. KEIR, Bankruptcy Judge.

On October 21, 1997, a Massachusetts Mutual Life Insurance Company (hereinafter "Lender") filed a motion seeking relief from the automatic stay imposed by 11 U.S.C. § 362(a) in this Chapter 11 case. Lender asserts two grounds for relief from stay, "cause" under § 362(d)(1) and that the Debtor holds no equity in its property and does not need it for an effective reorganization under 11 U.S.C. § 362(d)(2).[1]

The Debtor is a limited partnership holding as its sole asset a business office building located in Montgomery County, Maryland

---

1. In its Motion, the Lender also asserts lack of adequate protection but did not pursue that asserted ground. The court finds adequate protection as that term is defined by the seminal case of *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). The Lender's collateral is not depreciating in value or condition, is adequately insured and taxes are paid. Operating expenses of the property are being paid from revenues and rents received in excess of expenses are being remitted to the Lender pursuant to a cash collateral order.

(the "Property"). Debtor's creditors consist of the Lender which holds a First Deed of Trust upon the Property; trade creditors which at the date of the petition, September 30, 1997, were owed for debts arising during the last month of pre-petition operation; Diversified Investment Associates, Inc. ("Diversified"), a "mezzanine lender" pursuant to a loan arrangement made on the fourth day prior to the bankruptcy petition; unpaid management fees to Guardian Management, Inc.;[2] tenant security deposits; and obligations to shareholders.

Lender asserts that cause for relief from stay arises from the totality of circumstances under which this case was filed and is pending. Those circumstances include a pre-petition waiver of the right to contest a motion for relief from stay, the allegation that the bankruptcy case is essentially a two-party dispute between the equity interest holders of the Debtor and the Lender concerning the future potential for increase in value of the subject property, the fact that Debtor has no equity in its sole asset, and the alleged non-confirmability of Debtor's plan.

Lender, at times in its motion, has referred to these asserted facts as "bad faith" circumstances. In response, the Debtor argues that Lender must prove both subjective bad faith and objective futility under the holding of the United States Court of Appeals for the Fourth Circuit in the case of *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir.1989).[3] According to Debtor's view, the court may not grant relief from stay for cause because Debtor's assertion that it has a reasonable prospect of a reorganization within a reasonable time defeats a finding of objective futility. Debtor also argues that there is no subjective bad faith in its filing.

However, an examination of the grounds asserted by Lender as constituting cause for relief from stay and of the facts proven in the three days of evidentiary hearings, discloses that Lender's motion cannot be so narrowly construed, nor can the holdings in *Carolin*

*Corp.* be so broadly applied. In effect, Debtor's argument would limit "cause" under 11 U.S.C. § 362(d)(1) to either lack of adequate protection or bad faith motive for filing. Thus, to gain relief from stay for cause in cases where adequate protection exists, a movant would be required to prove both prongs of the *Carolin Corp.* definition of bad faith motive.

▉ This court holds that cause for relief from stay is not limited to a lack of adequate protection or a finding of bad faith motive for filing the bankruptcy case. As stated by the Fourth Circuit in *In re Robbins*, 964 F.2d 342, 345 (4th Cir.1992), "[b]ecause the [Bankruptcy] Code provides no definition of what constitutes 'cause,' courts must determine when discretionary relief is appropriate on a case-by-case basis." This court has similarly interpreted Section 362(d)(1): "11 U.S.C. § 102(3) construes the term "including" to not be limiting. Thus it is clear that cause, other than a lack of adequate protection, may be the basis for relief from the automatic stay." *In re Internal Revenue Service v. Bacha*, 166 B.R. 611, 612 (Bankr.D.Md.1993). It follows, that while circumstances which form cause for relief from stay may include a bad faith filing of the case, a finding of bad faith is not a prerequisite to a finding of cause.

An examination of the facts proven by the evidence is necessary to evaluate the circumstances which in the aggregate, Lender asserts, constitute cause. The first of these is the pre-petition waiver by the Debtor of rights concerning the automatic stay.

In May, 1993, the original loan made by the Lender to the Debtor and secured by the Property was in default. After negotiations, in which the Debtor was represented by the firm of Whiteford, Taylor & Preston, L.L.P., a law firm having recognized expertise in the area of real-estate lending and bankruptcy, a detailed restructuring agreement was entered into by and between Lender and Debtor. The general partner of the Debtor at all

---

**2.** Guardian Management, Inc. has some common ownership with the Debtor.

**3.** In *Carolin Corp.*, the Fourth Circuit holds that in order to dismiss a Chapter 13 case for reason

of Debtor's bad faith motive for filing the petition, the trier of fact must find both a subjective bad faith motive and objective futility in the attempt to financially rehabilitate.

relevant times [4] was Marvin Lang, a sophisticated real estate investor [5] and former president of Standard Federal Savings Bank.

The terms of the restructuring agreement include "(1) financing of $310,509.22 in past-due interest, (2) an advance of approximately $307,760.00 of new money, (3) an advance for delinquent real property taxes of $115,507.37, (4) deferral of certain payments, (5) a reduced interest rate, and (6) an extension on the maturity of its indebtedness to [Lender] through October 1, 1997." [6] Among the agreements made by the Debtor in the restructuring, is a three-tiered waiver of the right to protection against foreclosure through the filing of a bankruptcy case. The agreement provides, in essence, that the Debtor promises not to file a petition in bankruptcy before November 1, 1998. Second, the agreement provides that if the Debtor should become a debtor in bankruptcy, notwithstanding the aforesaid promise, that the stay imposed by 11 U.S.C. § 362(a) is waived as to actions by the Lender against the property. Finally, the agreement provides that if the stay does apply as against foreclosure by the Lender, the Debtor waives the right to defend against a motion for relief from the stay.

Lender does not assert the enforceability of the first and second parts of the agreement but asserts that the waiver of the right to defend against the motion for relief from stay by the Debtor, in the context of a pre-petition restructure agreement, is part of the factual circumstances which justify relief from stay for cause.

The courts have uniformly held that a waiver of the right to file a bankruptcy case is unenforceable. *See Fallick v. Kehr,* 369 F.2d 899 (2nd Cir.1966); *In re Heward Bros.,* 210 B.R. 475 (Bankr.D.Idaho 1997); *In re Madison,* 184 B.R. 686 (Bankr.E.D.Pa.1995);

*In re Freeman,* 165 B.R. 307 (Bankr.S.D.Fla. 1994); *In re Adana Mortgage Bankers, Inc.,* 12 B.R. 989, (Bankr.N.D.Ga.1980), *vacated by joint motion of parties,* 687 F.2d 344 (11th Cir.1982). Further, courts have not permitted pre-petition waivers of protection afforded by a bankruptcy case to be self-executing. *In re Darrell Creek Assocs. Limited Partnership,* 187 B.R. 908 (Bankr.D.S.C.1995); *In re Powers,* 170 B.R. 480 (Bankr.D.Mass.1994). However, there is a split in the reported decisions as to whether or not a pre-petition agreement to relief from stay should be afforded any weight in determining the motion for relief from stay for cause.

Debtor asserts that the "more modern cases" turn away from an apparent trend to give effect to such agreements under specific circumstances, citing *In re Pease,* 195 B.R. 431, 432 (Bankr.D.Neb.1996).[7] This court disagrees with the Debtor's characterization of case law and respectfully declines to follow the decision in the *Pease* case.

As acknowledged in the *Pease* decision, the emerging decisional law is that pre-petition agreements waiving defenses to relief from stay may be considered as a circumstance in deciding whether relief from stay for cause should be granted. *Id.* at 432–33. *See also In re Darrell Creek Assocs. Limited Partnership, supra.*

Although it appears that no opinion has been reported in this district or by the Fourth Circuit Court of Appeals concerning this issue, two unreported decisions of this court have granted relief from stay based upon a pre-petition agreement. Chief Judge Mannes of this court addressed this issue in the case of *In re Merridale Gardens Limited Partnership,* No. 95–1–3091–PM, (Bankr. D.Md. October 19, 1995), *affirmed in unpub-*

---

4. According to the testimony of Anthony LaBarbera, Vice–President of the general partner of the Debtor, a new corporation was formed and substituted as general partner of the Debtor a few days prior to the petition date. Movant's Exhibit No. 9, at p. 21 (labeled as Transcript of Meeting Before Debtor's Creditors Held on November 3, 1997).

5. The court makes this finding based upon the courtroom testimony of Anthony LaBarbera. *See*

Transcript of Court Testimony of Anthony LaBarbera, Dec. 15, 1997, at p. 22–23.

6. Movant's Exhibit No. 1, at 3 (labeled Affidavit of R. Jay Molleur). *See also* Transcript of Court Testimony of Jay Molleur, Nov. 21, 1997, at 118–19.

7. Debtor's Opposition to Motion for Relief from the Automatic Stay, at 17 n. 20.

*lished opinion* No. S–95–3334 (D.Md. Feb. 28, 1996). The court stated:

> [N]o waiver provision will operate automatically, however. Resolution will generally be fact sensitive.... The trend among the courts which have addressed the issue appears to favor granting relief from stay when the debtor has agreed prepetition to such a waiver. Even if the court chooses not to enforce the agreement, it may weaken the debtors [sic] position and cause the court to look more favorably upon the motion.

*Id.*, Transcript of Court's Opinion, at 5 (quoting Jeffery Dahlgren, *How Do You Get Relief? The Effectiveness of Pre-petition Agreements for Relief from the Automatic Stay,* NORTON BANKRUPTCY LAW ADVISOR, Sept. 1995, at 11).

 This court holds that prohibitions against the filing of a bankruptcy case are unenforceable, self-executing clauses in pre-petition agreements purporting to provide that no automatic stay arises in a bankruptcy case are contrary to law and hence unenforceable, and that self-executing clauses in pre-petition agreements that purport to vacate the automatic stay are likewise unenforceable. However, a pre-petition agreement that consents to relief from stay, or provides that the debtor will not contest a motion for relief from stay, may be considered as a circumstance in determining whether cause exists for relief from stay.

Quoting again from the *Merridale Gardens* decision,

> "I believe that in the final analysis waiver is a factor in the decision as to whether cause exists to modify the stay, and as in so many other bankruptcy cases, it is a balancing process that requires consideration of a number of factors. I have set out some of those factors. One, the sophistication of the party making the waiver; two, the proximity in time between the waiver and the filing of the bankruptcy case; three, the consideration for the waiver[;] that is are there substantial concessions, is the risk assumed by the lender, that is if the lender is undersecured does the lender go further out, is the debtor under water, what is the length of the forbearance.

> Another factor I would consider is the feasibility of debtor's plan and going back to the waterfront, is the plan one of a rising tide raising all boats; is it a Cinderella plan that "some day my prince will come;" is it a plan that depends up[on] either lightening or flood to convert an inventory into cash, or is there a positive cash flow.

> Finally, the last factor is whether other parties are affected, is there a large unsecured group of creditors, are their junior liens that will be wiped out, are there subordinated leases that will disappear, are there employees who will not have a job if the stay is terminated?"

*Merridale Gardens, supra,* Transcript of Court's Opinion, at 15–16.

Applying the above enumerated factors to this case, the sophistication of the Debtor here could hardly be greater in this court's mind. At all relevant times, the Debtor was a partnership controlled by a person and a family having sophisticated real-estate experience. During the restructuring in 1993, Debtor was represented by counsel in a firm with extensive practice in this area.

The consideration afforded to the Debtor in the restructure agreement included a four year extension of the maturity date of the loan, a reduction in the interest rate, extension of new credit in the approximate amount of $307,000.00 in cash, plus $310,000.00 in capitalized interest payments, placing the loan upon a current basis. Debtor does not assert that this consideration is insubstantial.

Rather, Debtor asserts, in effect, that the waiver clause was not a true *quid pro quo* for the benefits gained by the Debtor. Debtor produced evidence that Lender knew from advice given by corporate counsel that such waivers were not necessarily enforceable. In effect, Debtor reasons that as Lender was willing to enter into the restructure knowing that the waiver might not be enforceable, Lender should gain no benefit from the clause. This court disagrees.

It does not detract from the consideration of the waiver, that the general counsel's of-

fice of the Lender circulated a discussion of bankruptcy waivers which called attention to their potential unenforceability in some courts. While cautioning the Lender that such clauses might not be enforceable, nonetheless it was corporate policy to ask for such waivers in restructure agreements. What is material is that the Debtor, being sophisticated and with sophisticated legal advice, agreed to the waiver now being tested before this court.

Feasibility of the debtor's plan is another factor identified in the *Merridale Gardens* decision but is also raised separately as a circumstance by the Lender urging the court to consider granting relief from stay.[8] The feasibility issue will be addressed subsequently in this opinion.

In weighing the factors enumerated in *Merridale Gardens,* the court stated: "In my analysis the most important factor is the sophistication of the borrower followed by the concessions given, the risk incurred by the lender, and the other creditors affected."[9] This court agrees with that method of weighing. Having discussed the sophistication of the borrower and the concessions given in the restructure agreement, the court now looks at the potential effects upon other creditors.[10]

■ Although there are unsecured trade creditors and scheduled claims for Diversified as a mezzanine lender, this case is essentially a two-party dispute between the equity holders of the Debtor and the Lender. Generally, bankruptcy is not favored as the means for resolving such a two-party dispute. *In re 9281 Shore Road Owners Corp. (9281 Shore Road Owners Corp. v. Seminole Realty Co.),* 187 B.R. 837 (E.D.N.Y.1995); *In re Darrell Creek, supra; In re Powers, supra.*

This court finds that the claims of Diversified are not material because those claims were artificially manufactured on the eve of bankruptcy in an attempt to prevent the very finding which this court makes. In addition, the Diversified transaction is found to be an attempt to create a separate class of secured creditor which will be utilized by the Debtor to cast a vote satisfying 11 U.S.C. § 1129(a)(10).[11]

■ This court will not elevate form over substance. See *In re Delray Associates, Limited Partnership,* 212 B.R. 511 (Bankr.D.Md.1997). Diversified became a creditor four days before the bankruptcy under an arrangement whereby a $100,000.00 note was written and signed.[12] Forty Thousand Dollars in cash was actually delivered to the Debtor to pay a retainer to the Debtor's attorneys.[13] The remaining $60,000.00 was "advanced" by Diversified, by placing that amount into an "escrow" account upon which a security interest was granted to Diversified.[14] This transaction purportedly created

---

**8.** Lender also argues the asserted non-feasibility of debtor's plan in support of its alternate grounds for relief under 11 U.S.C. § 362(d)(2).

**9.** *Merridale Gardens, supra,* Transcript of Court's Opinion, at 18.

**10.** In *In re Baltimore Ferst Limited Partnership,* No. 96–S–1668–SD, (Bankr.D.Md. Apr. 24, 1996), the court (Derby, J.) likewise held:

The second question is whether the debtor's consent to a motion for relief from the automatic stay is a binding and enforceable contract clause. In the context of a forbearance agreement by the creditor, the answer is sometimes. It might be as part of a negotiated workout for the purpose of encouraging as a matter of public policy, workout agreements between creditors and debtors. However, it's not a flat rule because changed circumstances must be taken into account that might make such a consent reasonable at the time made, but not reasonable at the time sought to be enforced because in a bankruptcy context the rights of other parties must be taken into account as well as their positions....
*Id.,* Transcript of Court's Opinion, at 14.

**11.** 11 U.S.C. § 1129(a)(10) provides: "(a) The court shall confirm a plan only if all of the following requirements are met: (10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."

**12.** Movant's Exhibits No. 15–16 (labeled as Promissory Note Dated September 26, 1997 and Pledge and Security Agreement Dated September 26, 1997, respectively).

**13.** Transcript of Courtroom Testimony of Anthony LaBarbera, Dec. 5, 1997, at 142–43.

**14.** *Id.*

an unsecured claim of $40,000.00 and a secured claim in the amount of $60,000.00. The loan was made by a company (Diversified) holding equity in other projects owned by the Lang family.[15] It was made to an insolvent partnership immediately before a planned bankruptcy of an entity whose only asset was over-liened. It is clear to the court that Diversified advanced the funds on the credit of Marvin Lang, the guarantor,[16] and for whose benefit as one of the equity holders, this case was commenced.

This court has held that 11 U.S.C. § 1129(a)(10) cannot be satisfied by artificially creating and impairing a class. The termination of the automatic stay will not be withheld to protect a creditor whose claim arose under such circumstances. *In re North Washington Center Limited Partnership,* 165 B.R. 805 (Bankr.D.Md.1994).

As to the trade claims and potential liability for security deposits, the Lender has committed to pay such claims in full, including the claim of Guardian Management, Inc., in effect subordinating Lender's secured claim to those claims.

What the equity holders seek to do is use the bankruptcy to strip down the secured lien, and extend the maturity on the stripped down amount for an additional seven years. The plan filed by the Debtor further provides that at the end of the extended maturity date, the property will be sold or refinanced and the reduced amount of the mortgage loan paid from the proceeds. Debtor projects that the proceeds will exceed the stripped down mortgage balance by an excess of Three Million Dollars which Debtor proposes to distribute to equity shareholders.[17]

State court and market procedures exist to adjust the competing rights of the two parties to the dispute before this court. If a negotiated arrangement cannot be successfully concluded, the equity holders and the Lender may compete at a foreclosure sale to become the holder of the interest in the property entitled to reap the upside benefit. The competitive bidding and market forces attendant thereto will determine the amount of such investment. From the testimony of Mr. LaBarbera, this is not a hollow opportunity, as the Lang family is described as having the economic substance to meaningfully participate in that process. For example, the "new equity" which the Debtor's plan proposes to obtain from the Lang family shareholders ($800,000.00) could be used as the down payment to obtain financing for an acquisition loan to provide funding for such a foreclosure bid.

Finally, this court does not find that there is a reasonable prospect that Debtor's plan will be confirmed and successfully carried out. Although this court does not have the benefit of a full hearing on confirmation of a plan, the facts concerning the present circumstances of the Debtor and the plan which Debtor has proposed were put into evidence at the hearing upon this motion.

■ This court has already commented upon the requirements of Section 1129(a)(10). It appears doubtful that a class of claims, without counting the votes of insiders, will accept the plan under circumstances which satisfy the 1129(a)(10) requirement. As trade creditors have now been offered one hundred cents in cash by the Lender, the court would query the motivation for ballots cast by an unsecured class of such creditors which sought to accept a lesser treatment. If claims are voted for an improper purpose, they must be disregarded in the balloting. 11 U.S.C. § 1125(e); *In re DeLuca,* 194 B.R. 797 (Bankr.E.D.Va.1996).

Even if trade creditors cast ballots accepting the plan that are counted, such claims constitute a small percentage of the amount of unsecured claims in this case. In an apparent attempt to isolate the large unsecured

---

**15.** Courtroom Testimony of Anthony LaBarbera, Dec. 15, 1997, at p. 23.

**16.** Movant's Exhibit 17 (labeled Marvin Lang's Guaranty of Payment Dated September 26, 1997).

**17.** Debtor's plan proposes that the Lang family will be the only source of new equity to be injected into the project. This limitation flies in the face of the holding of the Fourth Circuit in *In re Travelers Ins. Co. v. Bryson Properties (In re Bryson Properties),* 961 F.2d 496, 504–05 (4th Cir.1992).

claim resulting from the deficiency of the Lender, Debtor's plan has placed trade claims in a separate class "for administrative convenience." The number of such trade claims is not large and therefore this classification raises a question as to whether such separate classification is truly for administrative convenience or is for the purpose of improperly gerrymandering the balloting.[18]

██ Aside from the question of balloting, the financial feasibility of the plan appears unlikely. The Lender through testimony has established that it will not consensually agree to Debtor's plan. In order to confirm the plan over the non-accepting class containing Lender's secured claim, the plan must deliver to the Lender a stream of payments equal in the aggregate amount to the secured claim of the Lender and having a present value equal to the value of the collateral. 11 U.S.C. § 1129(b)(2)(A)(i)(II). The parties dispute both the amount of the value of the collateral and the discount rate necessary, in the form of interest payments, to provide the Lender the present value of its collateral.

The expert witness of the Lender testified that the market place in which the Lender participates would not make one loan for 100% of the collateral value, but would view the transaction in two parts. A similar analysis has been used in other cases and found approval in the reported decision in *In re Birdneck Apartment Associates*, 156 B.R. 499, 509 (Bankr.E.D.Va.1993). Among the facts testified to in this case by Lender's expert is that the market would not extend more than 75 percent of the value of the collateral on a 25 year amortization. In order to obtain a loan or investment for the remaining 25 percent, a shorter amortization, estimated by the expert at seven years, would be necessary.

Debtor did not produce an expert but relies upon the testimony of Mr. LaBarbera, the Vice–President of the general partner of the Debtor.[19] Without foundation, Mr. LaBarbera testified that the Debtor assumes

that funding would be available upon a pricing of 200 basis points above the seven year treasury rate (*i.e.* treasury rate plus 2%) for all of the funding. Further, Mr. LaBarbera assumed that the market would provide such funds on a 25 year amortization with a seven year maturity for the entire amount of the value of the collateral. This court finds Mr. LaBarbera's assumptions not credible and his testimony unpersuasive.

Although the Debtor, in attempting to show the feasibility of its plan, asserts in its projections that the cash flow generated by the property will be sufficient to fund the plan note plus operating expenses even using the value and note rate urged by the Lender, the projection is not based upon the loan terms which Lender's expert credibly testified were available in the market. Instead, the alternate projection by the Debtor continued to use the Debtor's unsupported assumption that funding would be available in the market place for 100% of the value of the collateral on a 25 year amortization. Absolutely no credible evidence was introduced to support that amortization. Debtor's proposed treatment therefore does not appear to meet the standards laid down in *United Carolina Bank v. Hall (In re Hall)*, 993 F.2d 1126 (4th Cir.1993). Nor will Debtor's income projections create sufficient cash to make plan note payments upon an amortization which Lender's expert testified represent the market place.

Therefore, this court finds from the evidence and after weighing the credibility of the witnesses, that the debtor's plan is not likely to be confirmed both because of failure to comply with 1129(a)(10) and failure to satisfy the "cram down" standards under 1129(b)(2).

██ The court concludes that cause has been proven to grant the requested relief form stay based upon the findings set forth above. These include Debtor's pre-petition agreement to not contest a request for stay

---

18. *In re North Washington Center Limited Partnership, supra.*

19. Mr. LaBarbera, who is also the president of Guardian Management, Inc., testified regarding his involvement with Marvin Lang in a number

of other investment situations, including those specifically involving Diversified. *See* Courtroom Testimony of Anthony LaBarbera, December 5, 1997 and December 15, 1997.

relief given as a part of a pre-petition restructuring in which substantial consideration was accorded to the Debtor. The Debtor was governed by a financially sophisticated person and fully represented by counsel. No other legitimate creditor's interest exists which is not protected by Lender's subordination/payment agreement.

In addition, the current circumstances include the uncontested fact that no equity exists in the property and the finding that Debtor's plan is not likely to be confirmed.